**SPECIALTY MANUFACTURING
CO., INC., Plaintiff,**

v.

**SCHOOL BUS PARTS OF CANADA,
INC., Defendant.**

**No. C–C–90–140–P.**

United States District Court,
W.D. North Carolina,
Charlotte Division.

Sept. 2, 1992.

Francis M. Pinckney, Shefte Pinckney & Sawyer, Charlotte, N.C., for plaintiff.

Charles H. Rabon, Jr., John T. Allred, Petree Stockton & Robinson, Charlotte, N.C., Stanley H. Cohen, Manny D. Pokotilow, Barry A. Stein, Caesar Rivise Bernstein Cohen & Pokotilow, Philadelphia, Pa., for defendant.

## MEMORANDUM OF DECISION

ROBERT D. POTTER, District Judge.

THE TRIAL of this Action was held before this Court without a jury on 6 January 1992 in Charlotte, North Carolina. Plaintiff alleges that Defendant and Plaintiff entered into a contract obligating Defendant to pay certain patent royalties to Plaintiff. Complaint of Plaintiff at 2. In addition, Plaintiff alleges that Defendant has refused to make royalty payments required by that contract. *Id.* at 3. Finally, Plaintiff alleges that Defendant has infringed a valid patent held by Plaintiff. Appearing for Plaintiff at trial were Francis M. Pinckney and Dalbert U. Shefte of the Charlotte law firm of Shefte, Pinckney & Sawyer. Appearing for Defendant at

trial were Manny D. Pokotilow and Max Goldman of the Philadelphia, Pennsylvania law firm of Caesar, Rivise, Bernstein, Cohen & Pokotilow, Ltd. and John T. Allred of the Charlotte law firm of Petree Stockton. In order that this Court may enter Judgment, the Court now makes the following Findings of Fact and Conclusions of Law.

### FINDINGS OF FACT

Specialty Manufacturing Company, Inc. ("Specialty") manufactures actuating units for school bus stop arms and crossing arms. Trial Transcript at 14. School Bus Parts of Canada, Inc. ("School Bus Parts") also manufactures actuating units used for the same purposes. *Id.* at 28. Sometime in the 1980's, Specialty brought Civil Action No. C–C–88–250–P against School Bus Parts, doing business as BMR Manufacturing Company, for patent infringement. *Id.* In March of 1989, just prior to trial before this Court, Specialty and School Bus Parts entered into a Judgment by Consent resolving C–C–88–250–P in Specialty's favor. Plaintiff's Trial Exhibits 2 & 3. In part, that Judgment provided that:

2. [Specialty] owns all of the right, title and interest in and to U.S. Patent Nos. 4,559,518 and 4,697,541 (hereafter "Patents").

3. The Patents are valid and enforceable, and [School Bus Parts] has manufactured and sold apparatus which infringes the Patents.

4. [School Bus Parts] is enjoined from hereafter infringing the Patents, and from making, using or selling any apparatus within the scope of any claim in the Patents except as licensed under an Agreement entered into by [Specialty] and [School Bus Parts].

Plaintiff's Trial Exhibit 2. The Agreement entered into by Specialty and School Bus Parts in part provided that School Bus Parts would pay a royalty to Specialty for each actuating unit sold by School Bus Parts during the term of the Agreement. Plaintiff's Trial Exhibit 3.

School Bus Parts paid Specialty royalties pursuant to this agreement for some months after the March 1989 effective date of the licensing agreement. However, royalty payments soon ceased and in November of 1989, Counsel for Specialty informed Counsel for BMR Manufacturing Company that Specialty suspected School Bus Parts was manufacturing and selling units which infringed the patents held by Specialty. Plaintiff's Trial Exhibit 32; Trial Transcript at 32. Not surprisingly, School Bus Parts denied infringement. Plaintiff's Trial Exhibits 28 & 34. As a result, by letter dated 15 May 1990, Counsel for Specialty informed BMR Manufacturing Company that Specialty believed BMR Manufacturing Company was manufacturing units which infringed Specialty's U.S. Patent No. 4,599,518 (the "'518" patent). Plaintiff's Trial Exhibit 21. In addition, on that same date, Specialty terminated—effective 24 June 1990—the licensing agreement it had earlier entered with School Bus Parts. *Id.* Moreover, on 3 May 1990, Specialty filed this action against School Bus Parts. Complaint of Plaintiff at 1.

As noted above, School Bus Parts denied that its products infringed the '518 patent held by Specialty. Rather, School Bus Parts contended that its products, referred to by the Parties as Modification No. 1 and Modification No. 2, represented new devices which had been designed around Specialty's '518 patent. Trial Transcript at 77. School Bus Parts obtained patents on each of these products: Modification No. 1 is reflected in School Bus Parts' U.S. Patent No. 4,916,372 (the "'372" patent) and Modification No. 2 is reflected in School Bus Parts' U.S. Patent No. 5,036,307 (the "'307" patent). Plaintiff's Trial Exhibits 7 & 20; Trial Transcript at 53, 67. Specialty contends that both Modification No. 1 and Modification No. 2 infringed its '518 patent.

To facilitate further discussion, the Court will set out below Figures 1, 2, and 3, representing Specialty's '518 patent, School Bus Parts' '372 patent, and School Bus Parts' '307 patent.

Figure 1
(the '518 patent)

Figure 2
(the '372 patent)

Figure 3
(the '307 patent)

---

Central to Specialty's claims before this Court is Claim 1 of the '518 patent. In its entirety, that Claim provides:

1. Electric battery operated apparatus for mounting and operating safety devices on a vehicle such as a school bus stop signal or crossing arm in coordination with accepting and discharging passengers and opening and closing the main entrance door on the vehicle, comprising in combination for each such safety device on the vehicle:

(a) a housing having integrally joined walls to provide a box-like internal housing cavity and means enabling

said housing to be releaseably secured to an exterior mounting surface of the vehicle;

(b) a uni-directional DC motor mounted and secured within said housing;

(c) a safety device mounting and linkage arrangement including switch actuator means positioned by said motor and linkage members connected to be actuated by said motor;

(d) a safety device such as a school bus stop signal or crossing arm having an inner edge portion secured to said linkage members and adapted to being normally pivoted by said safety device mounting and linkage arrangement between a retracted position in which the safety device extends rearwardly and parallel to said mounting surface and a deployed position in which the safety device extends outwardly and perpendicular to said mounting surface;

(e) first and second normally closed limit switches mounted in opposed positions proximate said motor and switch actuation means, said first switch being arranged to be contacted by said switch actuator means when said safety device is in said deployed position and said second switch being arranged to be contacted by said switch actuator means when said safety device is in said retracted position;

(f) an electric control switch mounted on said vehicle and having first and second positions corresponding to deployment and retraction of said safety device; and

(g) relay switching means including connecting wiring enabling said motor to be connected to the vehicle battery through a first relay established path and through said second limit switch in a first circuit configuration when said control switch is moved to its said first position with said actuator means being in contact with said first limit switch and in which first circuit configuration said linkage arrangement is actuated by said motor shaft rotating in a given direction to move said safety device to said deployed position whereupon said second limit switch is electrically opened by contact with said actuator means and said battery is disconnected from said motor and enabling said motor to be connected to the vehicle battery through a second relay established path and through said first limit switch in a second circuit configuration when said control switch is moved to its said second position with said actuator means being in contact with said second limit switch and in which said second circuit configuration said linkage arrangement is actuated by said motor shaft rotating in the same said direction to move said safety device to said retracted position whereupon said first limit switch is electrically opened by contact with said actuator means and said battery is disconnected from said motor.

Plaintiff's Trial Exhibit 1. Of the elements of this Claim, School Bus Parts does not dispute that its Modification No. 1 and Modification No. 2 contain elements identical to those set out in paragraphs (a) and (b) of Claim 1. Trial Transcript at 101.

As set out in Claim 1, and using the reference numbers of Figure 1, the operation of the '518 patent is as follows:

When the bus driver opens the door, the switch 117 is closed. When the door switch 117 is closed, a circuit is made through relay 116 through the battery to ground. That energizes the relay 116. When relay 116 is energized, relay contact 115 is moved from the terminal 100–C to 100–B to 100–A.... That closes a path from the battery up through contact 100–A, through lead line 98, through switch 34, down out of switch 34–B, up lead line 104, through the motor and back to ground. That energizes the motor 31. When the motor is energized ... the motor stops rotating. The contact arm moves with the upward shaft 42 of the motor and it moves 180 degrees until it hits the switch 34. When it hits the switch 34, it opens the switch. When it opens the switch, it breaks or disconnects the battery from the motor breaking the circuit and stops the motor at that time. Now the arm of the bus, the deployment

arm for the signs is manipulated by the rotation of shaft 42. So when the shaft rotates, 42 rotates enough degrees to swing the arm up 90 degrees, the limit switch 34 will stop it. And at that point in time, the door is open. After the children get off the bus, then the door is closed. When the door is closed, switch 117 is open. That de-energizes relay 116. When relay 116 is de-energized contact arm 100–C moves to its downward position. Therefore, [there is] another path from the battery 95 through contact arm 115, contact 100–B, lead line 99, up through switch 35, down to terminal 103, up lead line 104, through the motor back to ground.... [A]s the [actuator 45] starts rotating, the arm on the bus begins retracting so that when this is rotated 180 degrees, the arm is retracted 90 degrees back along side the bus. When it gets to the position, when the arm 45 gets in contact with switch 35, it breaks the switch, opens the switch, stopping, disconnecting the battery from the motor 31.

Trial Transcript at 98–99. Now, referring to Figure 2, which, as noted, represents School Bus Parts' '372 patent, one may compare the operation of Specialty's product to the operation of School Bus Parts' Modification No. 1. Thus, the relevant operation of Modification No. 1 is as follows:

When the [school bus] door is closed ... [switch 26] is ... open. [When the door is opened], switch 26 is closed ... It energizes relay 18. Relay 18 is connected between the positive and negative terminal of the battery. That draws relay contact 18–C into contact with point 18–B. That completes a circuit ... from the plus side of the battery, through motor 17, through relay contact 18–C, terminal 18–B, back through switch element C–1, down through rotor [22] through [a] line back to the other side of the battery. That energizes the motor.... [W]hen the motor starts rotating, this deadspot [25] ... carried on rotor 22 rotates ... 180 degrees until it lifts contact arm C–1 off of the commutator. When it lifts it off of the commutator, it disconnects [the battery] from this motor. The negative side is broken.... When the negative side is disconnected from the motors, the motor stops.... [T]he [stop] arm is [then] fully deployed.

. . . .

[When the door is closed again] switch 26 is opened, relay 18 is de-energized. That causes the contact arm to come in contact with contact arm 18–C [to contact terminal] 18–A. That completes the circuit back to the negative side. The circuit extends through the positive side of the battery, through the motor 17, through the contact arm 18–C, terminal 18–A, down through the bottom line, through switch element 62, through ... the rotor, through lead here, back to the negative side. That continues until the dead spot [25] or the protrusion moves all the way around and lifts the contact— flexible contact arm C–2 off of the commutator. When it lifts it off of that rotor, it disconnects the battery from the motor by opening this circuit to stop the motor.

*Id.* at 106–08. Given this sequence of operation, Specialty's expert testified that he believed School Bus Parts' Modification No. 1 infringes Specialty's '518 patent because "it operates the same way." *Id.* at 108.

School Bus Parts' Modification No. 2, as represented in Figure 3, operates in much the same manner:

[The school bus door is open, the stop arm is being deployed.] That means the [door] switch has already closed and it's starting to rotate.... When the switch is closed, contact 48 is in contact with element 52.... The positive side of the battery goes through the switch, goes through relay 84 to ground. That energizes relay 84 to bring the contact down in contact with element 88.... [W]hen element 88 is in contact with that, you have an open circuit through relay 104. And relay 104 when it's de-energized, when it's an open circuit, it's down in a position where it's in contact—moveable contact, ... with 108. That causes a circuit to be closed to the relay contacts, to the motor, to relay contact 108, to lead line 114, through the motor, down to

ground 100. That energizes the motor. The motor stops running. It runs until the element 48 comes in contact with element 54 and at that time, a closed circuit is made through relay 104. And when relay 104 is energized by closing the circuit, the moveable element of relay 82 flips to the top position. That breaks or opens the circuit and disconnects the motor from the battery and stops the motor. So when this element 48 reaches [64], it stops the rotation of the motor.... [Now,] the door is completely open.... Then after the children go on the bus, the door switch is open.... [There is] [n]o current going through relay 84, therefore it's de-energized and contact [80] flips up to the top. When it flips up to the top, it breaks the circuit to the relay 104. And when relay 104 is de-energized ... its contact flips to the bottom and contact 108 ... connects the battery to the motor through the [line] 114 down to ground 100. When the motor starts operating, it rotates. It started right there at contact [64], terminal 48 it starts rotating ... until it hits element 56. When actuator 48 hits element 56, the circuit is closed through the motor, through relay contact 86 of relay 80 to energize to relay 104. When 104 is energized, it flips its moveable contact with 106. The breaker is disconnected from the contact of the battery and stops rotation of the motor.... [R]elay contact 82 flips back to the top and contacts 106 to break the circuit. [The battery is then] disconnected from the motor.... It's an open circuit.

Trial Transcript at 110–12. Given this sequence of operation, Specialty's expert testified that School Bus Parts' Modification No. 2 (the '507 patent) does not literally infringe Specialty's '518 patent. *Id.* at 112. However, Specialty's expert further testified that School Bus Parts' Modification No. 2 does infringe Specialty's '518 patent under the Doctrine of Equivalents. In a brief summation of his testimony, Specialty's expert explained that he found infringement under the Doctrine of Equivalents because:

[Modification No. 2 is] a mere reversal of parts.... [Claim 1 of the '518 patent] had a normally closed switch. [School Bus Parts] went to a normally opened switch. So when you go to a normally opened switch if you want to accomplish the same thing as a normally closed switch does, you have to put something else in the circuit. So they added a relay and so the relay contacts are in directly series relationship, the relay contacts 108 in series with the motor where in the claim invention the limit switches are in series with the motor. But since they went to a normally open limit switch, they had to put the relay in the circuit. But they operate—the function is the same and they're doing it in substantially the same way to get the same results....

Trial Transcript at 127–28. Specialty's expert further supported this conclusion through the use of a hypothetical claim sufficient in scope to literally cover Modification No. 1. Trial Transcript at 114–26.

## CONCLUSIONS OF LAW

As noted above, Specialty contends that School Bus Parts' Modification No. 1 literally infringes Specialty's '518 patent and that School Bus Parts' Modification No. 2 infringes Specialty's '518 patent under the Doctrine of Equivalents. In the interest of clarity, the Court will address separately Modification No. 1 and Modification No. 2.

### Modification No. 1

To establish literal infringement, Specialty must demonstrate that every limitation set forth in Claim 1 of the '518 patent is found in School Bus Parts' Modification No. 1. *Laitram Corp. v. Rexnord, Inc.,* 939 F.2d 1533, 1535 (Fed.Cir.1991). Specialty bears the burden of proving infringement by a preponderance of the evidence. *Id.* Put as simply as possible, the question for the Court is this: In School Bus Parts' Modification No. 1, is the combination of the rotor 22, the contact arms C1 and C2, and the deadspot 25 identical to the motor 31, the arm 45, and the limit switches 34 and 35 of the '518 patent?

■ The Court cannot answer this question without referring to the claims of the '518 patent. "A claim in a patent provides the metes and bounds of the right which the patent confers on the patentee to exclude others from making, using, or selling the protected invention." *Corning Glass Works v. Sumitomo Elec. U.S.A., Inc.*, 868 F.2d 1251, 1257 (Fed.Cir.1989). The claims describe and set forth the invention by a series of limiting words or phrases. These limitations must be interpreted and then "read on" the accused structure "to determine whether each of the limitations recited in the claim is present in the accused structure." *Id.* at 1258.

The language of Claim 1 of the '518 patent has been set forth above. Moreover, the operation of Modification No. 1 has also been described. A comparison of Claim 1 of the '518 patent to the operation of Modification No. 1 reveals that Claim 1 reads onto Modification No. 1. As such, Modification No. 1 literally infringes Specialty's '518 patent. In both the '518 patent and Modification No. 1, the stop or crossing arm is operated by an electrical motor which is started and stopped by switches. In Modification No. 1, the arrangement of contact arms C1 and C2, the deadspot 25, and the rotor 22 performs exactly the same function as the motor 31, the arm 45, and the switches 34 and 35 of the '518 patent. That is, controlling the movement of the safety device.

### Modification No. 2

■ Infringement may be found under the Doctrine of Equivalents if an accused device "performs substantially the same overall function or work, in substantially the same way, to obtain substantially the same overall result as the claimed invention." *Pennwalt Corp. v. Durand–Wayland, Inc.*, 833 F.2d 931, 934 (Fed.Cir.1987) (en banc), *cert. denied*, 485 U.S. 1009, 108 S.Ct. 1474, 99 L.Ed.2d 703 (1988). However, even if this test is met, there is no infringement if the asserted scope of equivalency of what is literally claimed would encompass the prior art. *Wilson Sporting Goods v. David Geoffrey & Assoc.*, 904 F.2d 677, 683 (Fed.Cir.), *cert. denied*, —— U.S. ——, 111 S.Ct. 537, 112 L.Ed.2d 547 (1990). Here, School Bus Parts contends that Specialty's '518 patent is limited by an earlier Specialty patent, the Latta U.S. Patent No. 4,339,744 ("the '744 patent"). School Bus Parts contends the '744 patent is prior art to the '518 patent. This contention is wrong. *See e.g. In re Katz*, 687 F.2d 450, 454 (C.C.P.A.1982) ("one's own work is not prior art under § 102(a) even though it has been disclosed to the public in a manner or form which otherwise would fall under § 102(a)").

■ When one compares the operation of Modification No. 2 to the '518 patent, it is clear there is no literal infringement: Claim 1 defines the limit switches as being "normally closed" and being opened by the switch actuator means, while in Modification No. 2 the limit switches are normally open and are closed by the switch actuator means. However, it is equally clear that Modification No. 2 performs substantially the same overall function, in substantially the same way, to obtain substantially the same overall result as the '518 patent. School Bus Parts' Modification No. 2 differs from the '518 patent only in the substitution of a normally open switch with an associated additional relay to serve the function of maintaining a closed circuit through the electrical motor while it is being operated for a normally closed limit switch. Such a substitution is a mere reversal of parts and cannot avoid infringement under the Doctrine of Equivalents. "Infringement is not avoided by a mere reversal or transportation of parts or components, or a mere change in form without a change in function." *Corning Glass Works v. Sumitomo Electric U.S.A., Inc.*, 671 F.Supp. 1369, 1399, 5 USPQ 2d 1545, 1569 (S.D.N.Y.1987), *aff'd*, 868 F.2d 1251 (Fed.Cir.1989). Thus, all elements recited in Claim 1 of the '518 patent or the equivalents of such elements, and the relationship of such elements as recited in Claim 1, are present in Modification No. 2. Accordingly, Modification No. 2 infringes the '518 patent under the Doctrine of Equivalents.

### Presumed Non–Equivalency

 School Bus Parts asserts that because it obtained patents on both Modification No. 1 and Modification No. 2, there is a presumption of non-equivalency. This Court does not find such reasoning persuasive: "where defendant has appropriated the material features of the patent in suit, infringement will be found 'even when those features have been supplemented and modified to such an extent that the defendant may be entitled to a patent for the improvement.'" *Atlas Powder Co. v. E.I. Du Pont De Nemours*, 750 F.2d 1569, 1580 (Fed.Cir.1984) (quoting *Bendix Corp. v. United States*, 199 USPQ 203, 1978 WL 21437 (Ct.Cl.Trial Div.1978), *aff'd*, 600 F.2d 1364, 220 Ct.Cl. 507 (C.C.P.A.1979)).

### Breach of Contract

School Bus Parts's Modifications No. 1 and No. 2 infringed the '518 patent held by Specialty. As such, following the termination of the licensing agreement between School Bus Parts and Specialty, School Bus Parts owed royalties to Specialty after the termination date of that agreement. The Court will today order an accounting of royalties due.

### CONCLUSION

This Court has today found that School Bus Parts' Modification No. 1 literally infringes Specialty's '518 patent and that School Bus Parts's Modification No. 2 infringes Specialty's '518 patent under the Doctrine of Equivalents. As such, School Bus Parts must pay royalties to Specialty for these acts of infringement. Moreover, the Court will today enjoin School Bus Parts from making, using, selling, or inducing others to make, use, or sell the invention described in the '518 patent. A Judgment will be entered simultaneously with this Memorandum of Decision.

### JUDGMENT

IN ACCORDANCE with the Memorandum of Decision filed simultaneously with this Judgment, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED:

1. Defendant shall account to Plaintiff for all royalties due and owing Plaintiff pursuant to the Settlement Agreement;
2. Defendant shall perform all its obligations under the Settlement Agreement;
3. Defendant is enjoined from making, using, or selling, or inducing others to make, use, or sell the invention described in Plaintiff's '518 patent; and
4. Defendant shall complete the above-required accounting within sixty days from entry of this Judgment.

This the 31st day of August, 1992.