**QUEEN'S UNIVERSITY AT KINGSTON, and Giram Company, Inc., Plaintiffs,**

v.

**KINEDYNE CORPORATION, Defendant.**

Civ.A. No. 94–2066–EEO.

United States District Court,
D. Kansas.

Dec. 20, 1995.

John A. Lahive, Jr., Ralph A. Loren, Ann Lamport Hammitte, James E. Maslow, Lahive & Cockfield, Boston, MA, and Katherine E. Rich, Holman, McCollum & Hansen, P.C., Prairie Village, KS, for plaintiffs.

Thomas V. Murray, Barber, Emerson, Springer, Zinn & Murray, Lawrence, KS, James L. Sigel, Ropes & Gray, Boston, MA, and Thomas N. Young and Gerald T. Tschu-

ra, Krass & Young, P.C., Troy, MI, for defendant.

## MEMORANDUM AND ORDER

EARL E. O'CONNOR, District Judge.

In this patent infringement action, plaintiffs Giram Company, Inc. ("Giram") and Queen's University at Kingston ("Queen's") seek damages for alleged infringement by Kinedyne Corporation ("Kinedyne") of claims 1, 2, 3 and 5 of United States Patent No. 4,427,210, pursuant to 35 U.S.C. § 281. Trial of this matter was bifurcated and the first phase, the liability issue, was tried to the court commencing October 2, 1995. After carefully considering all the evidence admitted during the two-day trial and the parties' briefs, the court makes the following findings of fact and conclusions of law, pursuant to Federal Rule of Civil Procedure 52(a).

### Findings of Fact

1. The patent-in-suit, United States Patent No. 4,427,210 ("the '210 patent"), which is entitled "Wheelchair and Occupant Restraint System," was issued January 24, 1984, and names Henk Wevers as the sole inventor. The '210 Patent is based on a Canadian Application filed March 2, 1982, to which it claims priority under 35 U.S.C. § 119.

2. Plaintiff Queen's is an educational corporation having a principal place of business at Kingston, Ontario, Canada. Queen's is the assignee of the '210 patent.

3. Plaintiff Giram is a New York corporation. Giram is the exclusive licensee of the '210 patent for the entire territory of the United States. Giram sells wheelchair and occupant restraint systems under the trademark of "Q'Straint."

4. Defendant Kinedyne is a Delaware corporation having a place of business in Lawrence, Kansas. Kinedyne manufactures and sells wheelchair and occupant restraint systems.

5. Queen's University and Giram accuse Kinedyne's integrated FE500 Series Mobility Aid Securement and Occupant Restraint System ("the accused system") of infringing claims 1, 2, 3, and 5 of the '210 patent under the doctrine of equivalents. Plaintiffs have abandoned all claims of literal infringement.

6. Giram and Kinedyne are competitors in the market for wheelchair and occupant restraint systems for use in motor vehicles. There are two broad categories of wheelchair and occupant restraint systems: parallel systems and integrated systems. In an integrated system, the occupant belt is connected to the wheelchair restraint system. In a parallel system the occupant belt connects directly to the vehicle floor independently of the wheelchair restraint straps. Forces are transmitted to the floor in both types of systems. While Kinedyne makes both parallel and integrated systems, only Kinedyne's integrated system is accused of infringing the '210 patent.

### The Patent-in-suit

7. The '210 patent-in-suit is directed toward a specific integrated wheelchair and occupant restraint system. A wheelchair tie down apparatus is claimed in which a pair of "bracket means" are each "arranged for mounting on respective laterally spaced apart frame members of [a] wheelchair, adjacent the rear and seat thereof." A first pair of flexible straps connect to a floor anchor and the front of the wheelchair through a "wheelchair engaging means" (the "front restraint straps"). A second pair of flexible straps connect the rear of the wheelchair to the "bracket means" through a "means for engaging said bracket means" (the "rear restraint straps"). A third pair of flexible straps has a tethered end which connects to a respective one of "said bracket means" and are extendible around the hips of the wheelchair occupant (the "occupant lap belt"). Each bracket is mounted on its respective frame member, adjacent to the rear of the seat, such that the second and third pairs of straps lie "in a substantially straight line so as to transmit forces applied" to the third pair of straps directly to an anchor for the rear tie down straps.

8. Claim 1 of the '210 patent is a combination claim in that it involves the wheelchair, a bracket, and a set of straps and calls for a particular arrangement of the bracket on a frame member. Claim 2 is similar in that it calls for three sets of flexible straps

and a bracket, referred to as a "bracket member," which is "arrangeable on its respective frame member." Claim 3 of the '210 patent is dependent on claims 1 and 2 and calls for a means to releasably lock each said "bracket member" against a respective frame member. Claim 5 is also dependent on claims 1 and 2 and calls for the flexible straps, in operative position, to subtend an angle between 35 and 45 degrees to the floor of the vehicle. The '210 patent discloses only one embodiment of "bracket means" or "bracket members."

9. Henk Wevers testified that an important result of his invention as embodied in the '210 patent is that the occupant can come on board a vehicle with the occupant restraint strap already installed and belted. This facilitates rapid and convenient securing of the wheelchair and occupant for transport. He also testified that the straight line transfer of forces was critical to his design because it reduced the force on the occupant during a collision.

10. The patented invention embodied in the '210 patent met with "resistance by the public" and was not commercially successful, at least in part, because the bracket did not fit some wheelchair types or models and had a tendency to impose torque on the wheelchair frame during a collision. After the patent issued, Giram designed at least two new commercial embodiments to overcome the deficiencies of the bracket disclosed in the '210 patent. These new Giram systems much more closely resemble the accused product, than does the system disclosed in the '210 patent.

*The Accused System*

11. Development of the accused device began with Kinedyne's predecessor, Aeroquip Corporation ("Aeroquip"). Aeroquip designed and manufactured tie down strap assemblies incorporating D-rings for cargo restraints. Aeroquip began designing and manufacturing wheelchair restraint systems in the early 1970s.

In late 1986 and early 1987, Aeroquip began researching and developing parallel wheelchair and occupant restraint systems. In 1990, Kinedyne bought Aeroquip's cargo restraint division, which included the parallel wheelchair and occupant restraint products. Kinedyne began work on an integrated wheelchair and occupant restraint system in 1991 in response to consumer demand.

12. The accused Kinedyne system has a pair of flexible straps which attach to the front of the wheelchair, a pair of flexible straps which attach to the rear of the wheelchair, and a pair of flexible occupant restraint straps. The occupant restraint straps attach to the pair of rear straps and are releasably and adjustably engaged to each other. Each rear strap has a fitting at one end which engages a floor anchor system. The opposite end of each rear restraint strap has a snap hook. Each rear strap forms a fabric loop around the structural frame of the wheelchair and locks onto itself by attaching the snap hook into a D-ring.

The occupant restraint belt has a snap hook on one end which releasably engages the same D-ring as the snap hook on the rear strap. This belt arrangement transmits forces from the occupant restraint belt, through the flexible rear strap, to the floor anchor. The rear straps of the Kinedyne system subtend an angle of between 30 and 60 degrees to the floor of the vehicle, depending on the type of wheelchair.

*Function/Way/Result of the Patented and Accused Devices*

13. The bracket disclosed in claim 1 of the '210 patent performs the following primary functions: (1) serves as an attachment point for releasable rear restraint and occupant straps; (2) is a specific, immobile union point on the wheelchair frame for transmitting forces in a straight line; (3) enables the occupant belt to be installed around the occupant prior to and independently of the attachment of the rear restraint straps to the wheelchair frame.

The accused device does not contain such a bracket. The connection of the rear restraint strap with the occupant strap in the Kinedyne system is accomplished by a flexible strap looped around the wheelchair frame, D-ring, and snap hook combination. While this combination of elements performs the same function as the bracket in that it serves as an attachment point for the rear

strap and the occupant belt, it does not perform the other two functions accomplished by the bracket in the '210 patent. It does not provide an immobile union point (which establishes a fixed angle belt alignment) or permit the separate and independent attachment of the occupant belt prior to attachment of the rear restraint straps to the wheelchair frame.

14. The bracket disclosed in the '210 patent performs the above functions in the following ways: (1) by being clampingly engaged or mounted on the wheelchair at a selected location; (2) by being adapted to communicate with the ends of wheelchair restraint straps so that the straps can be released from the bracket; and (3) by having a friction fit with the wheelchair frame.

The combination of elements forming the connecting point of the rear and occupant straps of the accused device does not function in the same way as the '210 bracket by providing an attachment point for the occupant belt and rear restraint straps. The Kinedyne system does not involve a rigid bracket as a connecting point that is clampingly engaged or mounted on the wheelchair at a specific point. It does not allow independent release of the straps, and does not have a friction fit.

15. The bracket of the '210 bracket patented device accomplishes the following results: (1) establishes substantially straight line alignment of rear and occupant belts to facilitate the transfer of forces from the occupant to the vehicle floor through the rear restraint belt; (2) eliminates relative movement between the occupant and the wheelchair; (3) permits the occupant restraint to be secured independent of the wheelchair restraint. The '210 bracket also produces the following undesired results: (1) increases torque on the wheelchair frame; and (2) does not permit a uniform fit for various wheelchair types and models. In addition, the patented system requires that the bracket be premounted with a wrench.

The accused system accomplishes different results in that the rear restraint and occupant straps are not permanently aligned in a straight line; relative movement is not eliminated; and, most significantly, the occupant lap belt cannot be pre-installed. In addition, the accused device reduces the torque placed on the wheelchair frame and has a more uniform fit to accommodate most wheelchairs.

*Other Non-infringing Systems*

16. A third party competitor, Ortho Safe Systems, Inc. ("Ortho"), sells an integrated wheelchair and occupant restraint system known as the "Protector System." In a fashion similar to the Kinedyne system, the Protector System uses flexible straps for the front and rear wheelchair restraints which are looped around the wheelchair frame in a non-stationary manner. Similar to German patent '133, the Ortho Protector System is attached to the rear restraint straps at a point close to the rear strap floor anchor. Plaintiffs admit that the Ortho Protector System does not infringe the '210 patent.

*Prior Art*

17. Plaintiffs concede that the following components of wheelchair restraint systems were known or in public use before the September 17, 1981, "critical date" of the '210 patent: systems having flexible straps; systems having front anchor means; systems having rear anchor means; and systems having integrated occupant restraint straps.

18. Much of the relevant prior art pertaining to wheelchair and occupant restraint systems is comprised of German patent documents. The Patent Office Examiner cited several German patents as prior art during the prosecution of the '210 patent. German Patent DE 30 02 133, dated July 23, 1981, ("the '133 patent") discloses an integrated wheelchair and occupant restraint system using flexible straps for the front and rear restraints and the occupant belt. The '133 patent shows the use of flexible web loops to connect the front and rear restraints to the wheelchair. The occupant strap is attached to the rear restraint at a point close to the rear strap floor anchor.

German Patent DE 29 27 204, dated January 29, 1981, ("the '204 patent") discloses another wheelchair restraint system with an integrated occupant lap belt. The rear of the wheelchair is restrained by rigid rods anchored to the floor at one end and attached

to the wheelchair frame at the other end with a hook. The patent discloses an occupant belt which attaches to the rear restraint at the end closest to the wheelchair. The patent teaches that the rear restraint and occupant belt combination protects the occupant by transferring the forces that occur in an accident.

19. Another prior art German patent which was not before the Patent Office Examiner during the prosecution of the '210 patent is German Patent DE 28 27 377, dated January 12, 1980 ("the '377 patent"). The '377 patent discloses a releasable holding device for securing wheelchairs in a vehicle. A horizontal rod with a forked bracket on each end is attached to the wheelchair frame in a stationary manner. Each forked bracket serves as an attachment point for both the rear restraint strap and the occupant belt.

20. Another relevant prior art is United States Patent No. 4,257,644, dated March 24, 1981 ("the '644 patent"), which discloses a wheelchair tie down apparatus using flexible straps looped around a portion of the wheelchair frame to connect the front and rear restraint straps to the wheelchair in a manner similar to the accused device. The '644 patent does not disclose an occupant strap.

21. The following articles also constitute prior art for purposes of the '210 patent: A March 1981 article entitled, "Crash Protection Systems for Handicapped School Bus Occupants," which depicts a pair of flexible rear tie down straps manufactured by Aeroquip, Kinedyne's predecessor. The straps loop around the wheelchair frame and hook or clip back onto a D-ring attached to the strap, in a similar fashion to the accused device. A December 1980 article entitled, "Crash Protection Systems for Handicapped School and Transit Bus Occupants," depicts rear tie down straps and a lap belt attaching directly to the axle on the wheelchair frame.

*Evidence of Copying*

22. Inventor Wevers knew of Aeroquip's work in the area prior to developing the invention disclosed in the '210 patent. Likewise, Kinedyne personnel had knowledge of the '210 patent before designing the Kinedyne integrated wheelchair and occupant system. There is no evidence that either Wevers or Aeroquip/Kinedyne "designed around" the other's respective devices.

23. When designing and producing the Kinedyne system, Kinedyne management described the new system as "similar to Q'Straint." Kinedyne did not request an opinion of counsel as to the scope or validity of the '210 patent until after the filing of the present lawsuit. Nevertheless, the court finds that the credible evidence at trial establishes that Kinedyne did not copy the invention patented in the '210 patent.

*Conclusions of Law*

Plaintiffs allege infringement only under the doctrine of equivalents as first set forth in *Graver Tank & Mfg. Co. v. Linde Air Prods. Co.,* 339 U.S. 605, 607, 70 S.Ct. 854, 855, 94 L.Ed. 1097 (1950), and discussed most recently by the Federal Circuit in *Hilton–Davis Chemical Co. v. Warner–Jenkinson Co., Inc.,* 62 F.3d 1512 (Fed.Cir.1995). The doctrine of equivalents rests on the rationale that "limiting enforcement of exclusive patent rights to literal infringement 'would place the inventor at the mercy of verbalism and would be subordinating substance to form.' " *Id.* at 1517 (quoting *Graver Tank,* 339 U.S. at 607, 70 S.Ct. at 855).

To prevail on a claim of infringement under the doctrine of equivalents, a patentee must prove, by a preponderance of the evidence, that "the differences between the claimed and accused products or processes are insubstantial." *Id.* at 1517. The court assesses the substantiality of the differences between two products "according to an objective standard" viewed from "the vantage point of one of ordinary skill in the relevant art." *Id.* at 1519.

Traditionally, courts have applied the "function-way-result" test to measure the substantiality of differences between an accused and claimed device. *Id.* at 1518–21. The test focuses on whether an element of an accused device performs substantially the same function in substantially the same way to achieve substantially the same result as an element of the claimed device. *Id.* at 1518. In *Hilton–Davis,* the Federal Circuit held

that although the "function-way-result" test can be used to assess whether two devices are equivalent, it is only one of several relevant inquiries.

An important factor in assessing the substantiality of differences is "whether persons reasonably skilled in the art would have known of the interchangeability of an ingredient not contained in the patent with one that was." *Id.; see also Corning Glass Works v. Sumitomo Electric U.S.A., Inc.,* 868 F.2d 1251, 1261 (Fed.Cir.1989). "Known interchangeability" of an element in the accused device with a claimed element is "potent evidence that one of ordinary skill in the relevant art would have considered the change insubstantial." *Hilton–Davis,* 62 F.3d at 1519. The court finds that persons skilled in the art of designing restraint devices would not have known that the Kinedyne combination was interchangeable with the patented bracket of the '210 patent.

■ Evidence of copying or designing around the patent claimed is also relevant. "[C]opying suggests that the differences between the claimed and accused products or processes—measured objectively—are insubstantial." *Id.* Evidence that the accused product was "designed around" a patent claim weighs against a finding of infringement under the doctrine of equivalents and supports the inference that the developer designed substantial changes into the new product to avoid infringement. *Id.* at 1520. However, evidence of independent development is not relevant to an infringement determination. *Hilton–Davis,* 62 F.3d at 1522–23. Independent development assumes that the developer had no knowledge of the patented invention at the time the accused product was developed and therefore could not have altered the design one way or another in light of the patent.

■ "The doctrine of equivalents does not require a one-to-one correspondence between components of the accused device and the claimed invention." *Dolly Inc. v. Spalding & Evenflo Co.,* 16 F.3d 394, 398 (Fed.Cir. 1994). Even though a combination of compo-

nents performs a function performed by a single element in the patented invention, infringement can occur if the accused device contains every limitation or its equivalent. *Id.* Plaintiffs allege that the combination of (1) the D-ring; (2) the looped portion of the rear strap; (3) the snap hook on the rear strap, and (4) the snap hook on the occupant strap of the accused device is the equivalent of the claimed "bracket" in the '210 patent. We disagree.

■ The '210 patent consistently refers to a "bracket" means or member that is mounted to the wheelchair frame. Words used in a claim are to be given their ordinary meaning, unless it appears that the inventor used them differently. *Jonsson v. Stanley Works,* 903 F.2d 812 (Fed.Cir.1990). Contrary to plaintiffs' present assertions that the word "bracket" refers to any connecting point creating a straight line transfer of forces, there is no evidence that the use of "bracket" in any of the claims was intended to invoke this special and uncommon meaning. Webster's Unabridged Third New International Dictionary defines bracket as a "member that projects from a wall, pier, or other structure, and is usually designed to support a vertical load or to strengthen an angle." Especially in light of the drawings in the '210 patent,[1] we are convinced that the words "bracket," "bracket means," and "bracket member" in the '210 patent claims describe a rigid fixture, which can be mounted in a stationary position at a fixed point on the wheelchair frame in order to establish a fixed angular relationship between the occupant lap and rear wheelchair restraint belts.

The accused Kinedyne device does not come within the scope of any claim in the '210 patent. Nor does it perform substantially the same function in substantially the same way to achieve substantially the same result as an element of the claimed device. There are several important distinctions between the accused Kinedyne device and the device claimed in the '210 patent.

"An 'equivalent' of a claim limitation cannot substantially alter the manner of per-

---

1. To interpret a claim, courts properly consult the patent specification, drawings, and prosecu-

tion history. *Gargoyles Inc. v. U.S.,* 6 F.3d 787 (Fed.Cir.1993).

forming the claimed function." *Id.* 16 F.3d at 400. The bracket disclosed in the '210 patent is a rigid, stationary piece attached to the wheelchair at a fixed point. The bracket serves as a fixed connecting point that can remain permanently attached to the wheelchair. This facilitates ease and accuracy in attaching the restraint system. An undesired result caused by the rigid bracket is torque on the wheelchair frame during a collision. The bracket also does not provide a uniform fit for some wheelchair models.

By contrast, the Kinedyne system employs a flexible connecting mechanism involving a self-formed loop of the rear wheelchair restraint strap, a D-ring, and a releasable snap hook. This system avoids the torquing effect caused by the rigid bracket of the '210 patent and provides uniform fit for most wheelchair types.

■ Moreover, even if the combination of elements connecting the rear and occupant straps were found to be the equivalent of the '210 bracket, there can be no infringement because the asserted scope of equivalency of what is claimed would encompass prior art. *See Wilson Sporting Goods Co. v. David Geoffrey & Assoc.,* 904 F.2d 677, 683–84 (Fed.Cir.), *cert. denied,* 498 U.S. 992, 111 S.Ct. 537, 112 L.Ed.2d 547 (1990). "A patentee should not be able to obtain, under the doctrine of equivalents, coverage which he could not lawfully have obtained from the [Patent and Trademark Office] by literal claims." *Id.* at 684. Prior art limits the scope of equivalency because it "always limits what an inventor could have claimed" in prosecuting the patent. *See id.*

In the instant case, the scope of equivalency asserted by plaintiffs would encompass prior art. Plaintiffs urge that the "bracket" in the '210 patent is the equivalent of the looped belt, D-ring, snap hook combination connecting the occupant lap belt to the rear straps in the Kinedyne system. However, plaintiffs admit that systems having flexible straps, front and rear anchor means and integrated occupant restraint straps were known or in public use before the September 17, 1981, "critical date" of the '210 patent. Indeed, German patent '133 and United States patent '644, as well as other literature at the time, taught restraint systems using flexible straps looped around the wheelchair frame. The German '204 patent disclosed a straight line transfer of forces, albeit using rigid connecting rods instead of flexible straps. The primary distinction between the invention described in the '210 patent and prior art is the limitation of the rigid "bracket." Thus, plaintiffs cannot establish infringement by asserting that the rigid "bracket" is the equivalent of Kinedyne's combination of elements, because the independent elements were already in public use at the time of the prosecution of the '210 patent.

In summary, the Kinedyne system is much more similar to the commercial products developed by plaintiffs after the '210 patent was issued and the Ortho Safe system (which plaintiffs admit does not infringe the '210 patent), than to the invention claimed in the '210 patent. The simple answer to plaintiffs' claims is that a patent was never obtained on any of the subsequent product improvements that they now claim are embodied in the '210 patent. Giram did not apply for a new patent on the modified systems developed after the '210 patent issues or attempt to broaden the claims of the '210 patent pursuant to 35 U.S.C. § 251 (requiring a patentee seeking to broaden the claims of a patent to file for reissue within two years of the date of issuance of the original patent). *See also Hilton–Davis,* 62 F.3d at 1560–61 (dissenting opinion). Plaintiffs' present infringement claims under the doctrine of equivalents attempts to significantly expand the scope of the '210 patent beyond any reasonable construction of the patent language. Even under a liberal interpretation of the patent claims, Kinedyne's accused device does not infringe the '210 patent because the differences between the device claimed in the '210 patent and the accused Kinedyne device are substantial.

### Defendant's Motion in Limine

■ The court took defendant's motion in limine (Doc. # 93) under advisement at trial. The motion seeks to exclude comparisons of commercial restraint systems presently marketed by plaintiffs with Kinedyne's restraint

system to prove infringement. Defendant's point is well taken and the motion will be sustained. Infringement must be proven with regard to the device claimed in the patent, not commercial products alleged to embody the patented invention. *Loctite Corp. v. Ultraseal Ltd.*, 781 F.2d 861, 879 (Fed.Cir.1985); *ACS Hosp. Sys., Inc. v. Montefiore Hosp.*, 732 F.2d 1572, 1578 (Fed. Cir.1984). Moreover, the court finds that the commercial products submitted by plaintiffs are outside the scope of the '210 patent and, thus, are irrelevant to our infringement determination in the instant case. The court therefore notes for the record that only comparisons of the device described in the '210 patent with the accused Kinedyne product were considered in assessing plaintiffs' infringement claims.

IT IS THEREFORE ORDERED that the clerk shall enter judgment for the defendant, pursuant to Federal Rule of Civil Procedure 58, on all of plaintiffs' claims.

IT IS FURTHER ORDERED that defendant's motion in limine (Doc. # 93) is granted as set forth herein.